JAMES CARR, Respondent, *v.* THOMAS J. PARKER ET AL., Appellants.

May 31, 1881.

1. Where a judgment debtor's property is such that it cannot be taken on execution, the judgment creditor, after having exhausted his legal remedies, is entitled to equitable relief.

2. Where a judgment debtor has fraudulently conveyed his personal property, and the judgment creditor levies upon it, and, an indemnifying bond being demanded, is unable to give it, that he has no lien upon the property will not prevent him from recovering in a suit to set aside the fraudulent conveyance and subject the property to the satisfaction of the execution.

APPEAL from the St. Louis Circuit Court, BOYLE, J.
*Affirmed.*

JOY & SAMPSON, for the appellants : The plaintiff has a
complete remedy at law, and has therefore no standing in
a court of equity. — *Merry* v. *Fremon*, 44 Mo. 521 ; *Kent*
v. *Curtis*, 4 Mo. App. 121. The decree is not warranted .
by the petition nor by the evidence, and is impossible of
performance. — *Jones* v. *Hart*, 60 Mo. 357 ; *O'Reilly* v.
*Nicholson*, 45 Mo. 163 ; *Potter* v. *McDowell*, 31 Mo. 62.

H. D. WOOD, for the respondent : Equity has jurisdiction
at the suit of a judgment creditor to set aside fraudulent
conveyances of property made by a judgment debtor, or
to reach assets of the debtor which are in any manner
fraudulently vested in the name of another, and the prop-
erty which may thus be reached embraces everything which
may be subject to levy and sale at law. — Freem. on Ex.,
pghs. 424, 511 ; Bump's Fr. Conv. 508–511, chap. 22 ;
*Sheppard* v. *Joerson*, 12 Ala. 99 ; *Hill* v. *Ormsber*, 14 Ill.
233 ; *Steere* v. *Hoagland*, 50 Ill. 377 ; *Stewart* v. *Caldwell*,
54 Mo. 536. A lien upon the property is not essential to
give equitable jurisdiction. — *Alnutt* v. *Leper*, 48 Mo. 321 ;
*Merry* v. *Fremon*, 44 Mo. 521.

BAKEWELL, J., delivered the opinion of the court.

The petition alleges that plaintiff, in 1877, recovered judg-
ment in the Circuit Court of the city of St. Louis, against de-
fendant Thomas J. Parker, on an indebtedness contracted in
1874, for $21.50 ; that one execution issued on this judg-
ment was returned *nulla bona*, and that an *alias* execution
was levied in September, 1878, on the tug Alice Parker ;
that defendant Parker, Jr., the son of defendant Thomas
J. Parker, in pursuance of a scheme between the two de-
fendants to prevent plaintiff from collecting his judgment,
then and there gave notice to the sheriff that he claimed
the tug ; that the tug was appraised at $3,000, and the
sheriff demanded a bond of $6,000 of plaintiff, which he

was unable to give on account of poverty, whereupon the plaintiff released the tug; that, after contracting the debt in judgment, the older defendant conspired with his son to defraud his creditors, and in pursuance of this plan, without any consideration, conveyed to the younger defendant a large amount of personal property, and amongst other things, a steam tug called the Charles F. Nagel, worth $5,000; that in pursuance of this fraudulent scheme, in the spring of 1877, the father caused the tug Parker to be built, at a cost of $7,000, with funds of the father; and, by agreement between father and son, the Parker was registered as the property of the son; that all other personal property of the father has been placed beyond the reach of execution, and that he has no other property than the tug Parker out of which the money can be made, in whole or in part, on plaintiff's judgment.

The prayer is that the title of the son to the Alice Parker be declared void; that defendants be enjoined from encumbering or transferring the tug; that the property be taken possession of by the sheriff and sold, and the proceeds applied to plaintiff's demand and the costs of this suit.

The answer of defendants was a general denial. The decree was for plaintiffs, according to the prayer of the petition, and it directs defendant Thomas J. Parker to deliver the tug Parker to the sheriff.

1. It is contended that the facts in evidence did not warrant the court in finding that the tug belonged to defendant in the execution, or had been fraudulently transferred. Unless we are to discredit the witnesses for plaintiff, and to take as absolutely true the testimony of defendants, it appears from the evidence that Parker, Sr., owed $6,000 to a woman named Moore, in 1874, for which he executed three notes of $2,000 each, at one, two, and three years, on all of which judgments have been recovered, and one of which is the note that is the foundation of the plaintiff's judgment; that Parker, Sr., swore that he would

never pay these notes; that, in 1875, he was reputed to be well off; that he had made money freely in the business of " dropping " rafts with the tug Nagel, which he purchased in 1874. Parker, Jr., was twenty-one in September, 1874; up to the age of sixteen, he was at school; after that he worked with his father on the tug. He was her pilot in 1874. He complained that his father gave him little or no money. In the spring of 1875, the father transferred the tug to the son, the price named in the bill of sale being $3,500. The boat was run and the business was carried on just as before; the father paid the hands, bought the coal, and, in all respects, continued to act as if the tug and the business were his own. He said to one witness that he had put the tug in his son's name to escape liability for any damage she might do in harbor. To another witness who was in money troubles, he said, in a joking way: " Why don't you do as I have done; put your property in another name, so they can't get at it? " In 1877, the contract was made for building the Parker. The contract was made in the name of the son, and the contractors were paid ostensibly with the son's money. The son was never known to have any means of his own, except so far as he might be supposed to own these boats. He lived with the father, and apparently worked for him on both boats. When the father bought the Nagel, in 1874, the father boasted that he was worth $50,000. His bank-account for the years 1872, 1873, 1874, and 1875 shows deposits to the amount of over $12,000. The father carried rolls of money in his pocket whilst the son and father were working on the boats, and paid all demands. The son was never seen to have money, or to pay expenses of either boat.

The father testified that he did not remember what he paid for the Nagel — couldn't tell whether it was $3,500 or $500; that he probably lost money whilst running her; that he did not deposit any of his earnings, whilst running her, in the Bremen Bank, though his bank-account shows

deposits to the amount of over $9,000 in 1874, in the Bremen Bank, and it is not pretended by him that he had any other source of income. He says his son paid him $3,000 for the boat, cash, and that he kept this money in the house, and spent it. He also swore that he never executed the note sued on, and never heard of the note until execution was issued on the judgment; and that his name is not Thomas J. Parker, but Thomas Parker. In this last statement he is contradicted by his nephew and his brother, who swear that he was named Thomas Jefferson, after the President of that name.

The son testified in such a manner that he was cautioned by the court to remember that he was upon oath. He swore that he bought the Nagel in April, 1875, and paid for her in cash out of money he had earned working for his father on the tug, and for others; that he then had $1,000 left over, and with this and moneys earned afterwards by him with the Nagel, he paid for the Parker, which cost about $7,000, in the spring of 1877; that he carried his money on his person from the time he was twelve till he was twenty-one, when he had $4,000 in his money-belt; that he slept with it round his neck at night; that he had from $500 to $1,500 left when he bought the Nagel; and also, in direct contradiction to this, that he threw the money-belt away then because he had no money left; that he accumulated enough up to 1877 to pay $7,000 for the Parker in the spring of that year; that he used the $1,500 left after buying the Nagel, for different purposes. When asked where he kept his $7,000, he said he threw it on the floor; kept it in the cupboard; kept it in a bureau; and that he had some of it in bank. He had, he said, about $2,000 in bank, but did not know what bank. Then he said it was in the Tenth Ward Savings Bank; that he drew it all out in two weeks; that he never left his signature in bank; that he never drew any check; and that he did draw a check on getting his

money out; that he got his check back and lost it, or tore it up.

It is manifest that great reliance cannot be placed upon the testimony of defendants. The father is an illiterate man, unable to read or write; the son was at school for many years. The son seems to have testified with reckless disregard of the truth, and without even attempting a consistent statement; and wherever either father or son are directly contradicted by another witness, the statement of the other witness seems to be more worthy of belief. The weight of the evidence seems to be that both the Nagel and the Parker were purchased by the son, in a great measure, if not altogether, with the father's money; and that the boats were registered in the name of the son, in order that the father might have no property in his own name to answer for his liability on the notes given by the father to Mrs. Moore; that defendant Thomas J. owed at least $6,000, represented by the Moore notes, in 1875 and in 1877; and that he had no property in his own name subject to execution and accessible to the sheriff from 1875 to the date of the trial.

2. Where the creditor has obtained his judgment and ineffectually sought to enforce it, he is in a position to appeal to a court of equity to remove obstacles which may have defeated a collection at law; nor need he, when the property in question is real estate, show that he has a lien upon the property sought to be charged. *Merry* v. *Fremon*, 44 Mo. 521. Equity has jurisdiction at the suit of a judgment creditor to set aside fraudulent conveyances of property made by a judgment debtor, or to reach assets of the debtor which are in any manner fraudulently vested in the name of another. *Sheppard* v. *Iverson*, 12 Ala. 97. Nor has the plaintiff in this case any adequate remedy at law. Under our statute, where claim is made by some person not defendant in the execution, the sheriff must abandon the levy unless plaintiff tender a sufficient bond. Rev. Stats., sect.

2366. This it was impossible for the plaintiff in the present case to do; and if he cannot have the aid of a court of equity, he cannot enforce his judgment against the property of the defendant in the execution.

But fraud is said to be the most ancient foundation of equity jurisdiction; and is a sufficient ground for granting relief in a case like the one before us, because no relief is adequate that does not remove the fraudulent title. A fraudulent transfer being valid against a creditor at large, of course such a creditor has no standing in equity to set it aside. The creditor must first establish his demand. He must be a judgment creditor; and, ordinarily, in case of personal property, he must have a lien in order to give him that specific right which a court of chancery will recognize as warranting its interference. But where execution has been returned *nulla bona*, and the property is such that it cannot be taken on execution at law, the creditor having exhausted his legal remedies, equity will give relief. *Beck* v. *Burdett*, 1 Paige, 305 ; *Brown* v. *Bank*, 31 Miss. 454. In the present case, the property is not by nature such as cannot be taken on execution. It has been seized under plaintiff's writ; but it was released in accordance with the statute, because plaintiff cannot indemnify the sheriff. So far as this plaintiff is concerned, for no fault of his, he cannot retain a lien under his execution, because of the claim interposed by defendant Thomas Parker, Jr. We think, therefore, that plaintiff is entitled to the relief he asks.

3. Defendants claim that the decree in the case is one impossible of execution, because it appears from the evidence that the tug Alice Parker is sold to, and in the possession of, the St. Louis Coal Company, and was sold to them before this action was begun. Parker, Sr., in a deposition taken in another proceeding, and read in evidence in this case, swears that the tug Parker had been, at the date of his deposition (March 11, 1879), recently sold to the St. Louis Coal Company, though he further says that he

knows nothing about the sale. In the same deposition, he afterwards swears that the tug Alice Parker is, at the time of his statement, owned by his son, Thomas Parker, Jr. The testimony in the case fills about one hundred closely written pages; it has been read throughout. If there is any reliable evidence in the case that the tug Parker was sold to the Coal Company before the beginning of this action, it has escaped our attention. ·

We think the judgment should be affirmed.. It is so ordered. All the judges concur.